

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2015 FEB 13  PM 12: 04

**U.S. Department of Justice**

*United States Attorney*

*District of Maryland*

---

*Sandra Wilkinson*
*Chief, Major Crimes*
*Sandra.Wilkinson@usdoj.gov*

CLERK'S OFFICE
AT BALTIMORE

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4921*
*MAIN: 410-209-4800*
*FAX: 410-962-0716*

BY_____DEPUTY

February 9, 2015

## VIA EMAIL

Premal Dharia and Brendon Hurson
Assistant Federal Public Defenders
Office of the Federal Public Defender
100 S. Charles Street, 9th Floor, Tower II
Baltimore, MD 21201

Re:  Plea Agreement in *United States v. Michael Wesley Lee*, Crim. No. JFM-13-0678

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by **February 20, 2015**, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1.    The Defendant agrees to plead guilty to Counts One and Two of the Second Superseding Indictment now pending against him, which charges him with Use of Interstate Facilities to Promote and Facilitate a Prostitution Business, in violation of 18 U.S.C. § 1952(a), and Conspiracy to Commit Sex Trafficking by Force, Fraud, and Coercion, in violation of 18 U.S.C. §§ 1591(a) and 1594. The Defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

### Elements of the Offense

2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

a.    Count One:  (i) Interstate travel or the use of the facilities of interstate/foreign commerce (ii) with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on, of any unlawful activity, which in this case, is a business enterprise involving prostitution offenses in violation of the laws of Maryland and of the United States, and (iii) subsequent performance or attempted performance of an act to promote, manage, establish and carry on of such unlawful activity.

b.      Count Two:   The defendant knowingly and willfully entered into a conspiracy as charged in the Second Superseding Indictment, the object of which was: (i) recruiting, enticing, harboring, transporting, providing, or maintaining by any means a person or knowingly benefitted financially or received something of value by participating in a venture to recruit, entice, harbor, transport, provide, or obtain a person (ii) for a commercial sex act; (iii) in or affecting interstate commerce; and (iv) the defendant knew that the trafficked person's participation in the commercial sex act was, or was intended to be, caused by force, fraud, or coercion and the offense was so effected by force, fraud or coercion.

## Penalties

3.      The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: (i) for Count One:  five (5) years imprisonment a fine of $250,000 and three (3) years of supervised release and (ii) for Count Two: life imprisonment, a maximum fine of up $250,000, and up to five (5) years of supervised release.  In addition, the Defendant must pay $100 per count (total: $200) as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing.  This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1]  If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise.  The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked – even on the last day of the term – and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release.  The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

4.      The Defendant understands that as a consequence of his conviction for the crimes to which he is pleading guilty, he may be required to register as a sex offender in the place where he resides, where he is an employee, and where he is a student, pursuant to the Sex Offender Registration and Notification Act (SORNA), and the laws of the state of his residence.  Failure to do so may subject him to new charges pursuant to 18 U.S.C. § 2250.

## Waiver of Rights

5.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.      If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e.      If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against his. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences is the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

-3-

## Advisory Sentencing Guidelines Apply

6. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

7. This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt ⑤ (BAY) and to the following applicable sentencing guidelines factors: ✝

The government contends that ¶¶ 7a - g are the

a. Counts One and Two group. Four different women were trafficked and therefore the guidelines contained in Chapter Three, Part D (Multiple Counts) shall be applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction. The guidelines must be determined for each as if contained in a separate count.

b. Group 1 (Victim "J" - Count Four): The base offense level is 34. U.S.S.G. § 2G1.1(a)(1). Because the Defendant's role in the offense was that of an organizer, leader, manager, or supervisor in any criminal activity, an increase of 2 levels is appropriate. See U.S.S.G. § 3B1.1(c). The adjusted offense level for Group One is 36.

c. Group 2 (Victim "S" - Counts Five and Six). The base offense level is 14. U.S.S.G. § 2G1.1. There is a 4 level increase because the offense involved fraud and coercion. Because the Defendant's role in the offense was that of an organizer, leader, manager, or supervisor in any criminal activity, an increase of 2 levels is appropriate. See U.S.S.G. § 3B1.1(c). The adjusted offense level for Group Two is 20.

d. Group 3 (Victim "M" – Count Seven). The base offense level is 34. U.S.S.G.§ 2G1.1(a)(1). Because the Defendant's role in the offense was that of an organizer, leader, manager, or supervisor in any criminal activity, an increase of 2 levels is appropriate. See U.S.S.G. § 3B1.1(c). The adjusted offense level for Group Three is 36.

e. Group 4 (Victim "MS"). The base offense level is 14. U.S.S.G. § 2G1.1. The adjusted offense level for Group Four is 14.

f. Application of Multiple Count Rules: The Guidelines count as 1 unit the group with the highest offense level which is Group 1 (36). Because Group 3 is equally serious, the guidelines add an additional unit. Groups 2 and 4 are 9 or more levels less serious, thus there is no further increase. Two units equate to 2 additional guideline levels. Therefore, the adjusted offense level subtotal is 38.

✳ Mr. Lee contends that the adjusted offense level in ¶¶ 7(b) and 7(d) are 20. Mr. Lee contends that the adjusted subtotal in ¶ 7(f) should be 24, and a total offense level of 22 should be reflected in ¶ 7(g). Mr. Lee agrees to the stipulated sentence in ¶ 10, thus rendering this dispute moot.

-4-

(JAY)

g.   This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. **With an adjustment for acceptance of responsibility, the total adjusted offense level is 36.**

8.   The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

9.   This Office and the Defendant agree that, with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures, or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

## Rule 11(c)(1)(C) Plea

10.   The parties stipulate and agree pursuant to Fed. R. Crim. P. 11(c)(1)(C) that the following sentence is the appropriate disposition of this case: a sentence of **13 years** of incarceration followed by five (5) years of supervised release. For the purposes of this agreement, incarceration is a sentence to the Bureau of Prisons, and does not include any form of home confinement. This agreement does not affect the Court's discretion to impose any lawful fine or restitution. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(d)(2)(A).

## Obligations of the United States Attorney's Office

11.   At the time of sentencing, this Office will move to dismiss any open counts against the Defendant (One, Three, Four, Five, Six, and Seven).

*(BAH) (pen)*

12.   The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the counts of the Second Superseding Indictment that this Office has agreed to dismiss at sentencing.

## Forfeiture

13.   The Defendant understands that the Court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order will include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property subject to forfeiture. Specifically, as a consequence of the Defendant's plea of guilty to Count Two charging a violation of 18 U.S.C. §§ 1591 and 1594, the Court will order the forfeiture of any and all property, real or personal, used and intended to be used to commit and facilitate said violations and any property, real and personal, which constitutes and is derived

from proceeds traceable to said violations, pursuant to 18 U.S.C. §§ 981, 1594.

14.    The property to be forfeited includes but is not limited to the following: all cellular telephones and other property seized from the Defendant in the course of the investigation.

15.    The Defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

## Assisting the Government with Regard to the Forfeiture

16.    The Defendant agrees to assist fully in the forfeiture of the foregoing assets. The Defendant agrees to disclose all of his assets and sources of income to the United States, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. The Defendant also agrees to give this Office permission to request and review his federal and state income tax returns, and any credit reports maintained by any consumer credit reporting entity, until such time as the money judgment is satisfied. In this regard, the Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) as well as whatever disclosure form may be required by any credit reporting entity.

## Waiver of Further Review of Forfeiture

17.    The Defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The Defendant also agrees not to challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this agreement, and will not assist any third party with regard to such challenge or review or with regard to the filing of a petition for remission of forfeiture.

## Waiver of Appeal

18.    In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.    The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b.    The Defendant and this Office knowingly waive all right, pursuant to 18

-6-

U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

            c.        Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

            d.        The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

19.      The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement that would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1; (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report; (iii) moves to withdraw his guilty plea; or (iv) commits any offense in violation of federal, state, or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

20.      The Defendant expressly understands that the Court is not a party to this agreement. The Defendant understands that the Court is under no obligation to accept this plea offer made pursuant to Rule 11(c)(1)(C). The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

21.      This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete

plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have him sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By:

Sandra Wilkinson
Assistant United States Attorney

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

2/13/15
Date

Michael Wesley Lee

We are Michael Wesley Lee's attorneys. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

2/13/15
Date

Premal Dharia
Brendon Hurson
Counsel for Defendant

-8-

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

## ATTACHMENT A: STIPULATED FACTS, UNITED STATES v. LEE

*If this matter had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The parties agree that the following facts do not encompass all of the facts that would have been proven had this matter proceeded to trial.*

Defendant MICHAEL WESLEY LEE, a/k/a "King" or "King P," is 30 years old. He lived in various locations to include New York City, New York and Odenton, Maryland. The initial "P" stands for "Pimp."

From at least 2012 and continuing through his arrest in August 2013, LEE was a pimp who used social media websites such as "Tagged" and "Backpage" to persuade and entice females to engage in commercial sex acts for his personal financial benefit. On occasion, LEE used coercion, fraud, force, and threats of force to maintain control over some of the females. LEE and co-defendant ROBERT DOWNING, a/k/a "Luck," a/k/a "Shamrock", posted and advertised commercial sex services on "Backpage", and LEE used "Tagged" to communicate with potential female "employees" across the country regarding the prostitution business.

LEE rented or arranged the rental of hotel rooms to house the females and to serve as a place in which the prostitution business could operate. LEE regularly used prepaid gift and debit cards like Green Dot cards, RushCards, and Vanilla Visa Gift Cards, buying (or causing others to buy) such cards with cash from the sexual transactions of the prostitution business, and using those cards to pay for the advertisements for commercial sex services on Websites like "Backpage".

While conducting their prostitution business, LEE used cellular telephones (a) to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, or carrying on, of their prostitution business, including: persuading, inducing, and enticing, and facilitating individuals to travel in interstate commerce to engage in prostitution or in sexual activity for which any person can be charged with a criminal offense; (b) to take and receive photographs for use in advertisements for commercial sex services; (c) to compose, post, and buy advertisements for commercial sex services; and (d) to communicate regarding the prostitution businesses, with DOWNING, with clients, and with the females they were prostituting.

The following summarizes LEE's interactions with three separate females. These are not all of the women that LEE recruited and engaged for his prostitution business.

### Sex Trafficking Victim "J"

In or about February 2013, LEE transported a female (hereinafter referred to by the initial "J") from New York to Maryland with the intent that "J" engage in prostitution. On or about February 23, 2013, LEE and DOWNING accompanied "J" to Maryland Live!, a casino in Anne Arundel County, Maryland. On various video cameras throughout the casino, LEE and DOWNING are observed watching "J" unsuccessfully solicit prostitution customers during the early morning hours of February 23. Surveillance subsequently records LEE and "J" leaving the casino. The two proceeded to the garage area of Maryland Live!, ending up near LEE's vehicle.

1

LEE was first observed yelling at and scolding the woman; then, without warning, he assaulted her, striking her head repeatedly with a closed fist, grabbing her by the hair and ripping off her wig, and violently shoving her when she tried to shield her body against the car. "J" was seen on the video touching her lip in the area where LEE hit her. Police arrived soon thereafter and arrested LEE. "J" was on her cellular telephone as the responding security personnel were interacting with LEE. Approximately 26 minutes later, a vehicle registered to LEE's sister arrived on the scene. DOWNING was driving. Ultimately, "J" refused to press charges, and the assault charges were dismissed against LEE a few months later.

While incarcerated, LEE called his sister. During a recorded jail call on February 25, 2013 from LEE to his sister, the two discussed staying with her and using her address for release and bail purposes before she started discussing a girl who had escaped. She declined to go into detail, instead handing the phone off to DOWNING who said that he had set up the girl for a "date" for "a buck fifty". By using the terms "date" for "a buck fifty", DOWNING was referring to arranging a prostitution encounter for one of LEE's girls for $150. The money would be used for LEE's bail money. LEE told DOWNING that he "can't be talking like that." LEE directed DOWNING not to leave "J" alone; however, DOWNING did leave "J" in the room and "J" escaped.

## Sex Trafficking Victim "S"

In or about August 2013, LEE, using "Tagged" to communicate, persuaded, induced, and enticed a female (hereinafter referred to by the initial "S") to travel from Missouri to Maryland for the purpose of engaging in prostitution. On or about August 9, 2013, LEE arranged for the transportation of "S" from Missouri to Maryland with the intent that "S" engage in prostitution. On or about August 19, 2013, LEE transported "S" from Maryland to New Jersey for the purpose of engaging in prostitution.

Law enforcement identified "S" (then age 23) at the Baltimore Washington Medical Center after "S" reported that she was prostituted by LEE. LEE was stopped by police as he was driving just outside the hospital entrance, apparently waiting for "S" to be released and transported back to the hotel. "S" was interviewed by law enforcement and stated that on August 7, 2013, she was messaged by a person identified as "King P" (LEE) on a social networking site known as "Tagged.com." LEE enticed her to come to Maryland for a webcam business. He bought "S" a one-way Greyhound bus ticket to Baltimore for $208, leaving St. Louis on August 9 and arriving in Baltimore on August 10. In the car ride from the bus station, LEE told "S" that he was a pimp and that he had female "bitches" in several states making him money. He took "S" to the Microtel hotel in Linthicum Heights, Maryland and told her that he needed to hold onto her identification and that he kept the identification of all the girls that work for him. "S" was afraid to challenge LEE because of his size and his demeanor, so she gave him her identification card and worked as a prostitute. LEE told her that she needed to reimburse him for the bus ticket and that she had to pay an initiation fee of $1000, to "show that she was serious". She had no money of her own. "S" met two other females that LEE employed or attempted to employ as prostitutes. "S" worked as a prostitute for LEE for approximately two weeks. Eventually "S", who wanted to get away, called an ambulance regarding pain she was having in her vaginal area. Upon the arrival of the EMTs, she immediately reported her situation regarding

LEE and her desire to keep him away from her to EMTs who called the police. LEE was arrested that day.

Law enforcement has corroborated "S"'s report through various search warrant responses such as "Backpage", medical records, travel records, and telephone records and texts.

### Sex Trafficking Victim "M"

In or about August 2013, LEE persuaded, induced, and enticed a female (hereinafter referred to by the initial "M") to a hotel in Maryland for the purpose of engaging in prostitution. In August 2013, "M" (the aged 21) was working as an exotic dancer in Baltimore. Through an older female with whom she worked, "M" was told of a business opportunity to dance with other females at different clubs. This older female introduced "M" to LEE whom "M" only knew by the name "King." The female drove "M" to the Microtel hotel to meet LEE. "M" believed that LEE was the guy who would be driving her to different clubs to dance. There was only one other female present in the hotel room when "M" arrived. This female was subsequently identified as "S". "M" made observations in the hotel room that led her to believe King and the other woman ("S") were engaged in prostitution. For example, there was a big box of condoms in the room, the woman was wearing clothing that "M" did not believe was for dancing, and there were a number of wigs in the room. Soon thereafter, "M" left.

"M" advised her partner "A" about the interaction with LEE ("King'). "A" was a heroin addict and wanted "M" to work for money. "A" set up another meeting between LEE and "M". LEE picked "M" up in his car, a gold Nissan, and eventually drove "M" to the same Microtel hotel. "M" saw "S" again, an interaction that "S" confirms. Phone records confirmed the contacts and the times of this next meeting between LEE and "M". "M" began texting friends to come get her as she did not want to be at the Microtel hotel with LEE. When "M" tried to leave, LEE jumped in front of the door, blocked it and said words to the effect "you're not fucking leaving." "M" began acting nicer with LEE in order to pacify him. "S" asked "M" if she was scared and if "M" had ever done anything like this before, referring to prostitution. "M" said she had not.

Subsequently, "M" overheard LEE on the phone with a man who LEE said was from Florida and was driving up to meet "M". At that point "M" got scared about being made to have sex or being taken out of state. "M" devised a plan whereby she told LEE she was thirsty and needed something to drink. He gave her money to get a soda in a nearby vending machine and "M" used this opportunity to escape. She began running away from the hotel. She heard LEE running behind her. LEE chased her until she was able to hop a fence behind the hotel.

In the interim, "M"'s father learned that "M" was being held in the hotel room. "M"'s father called 911 and the police responded to the Microtel hotel but "M" had already escaped. LEE texted "M" "Yo u pulled a move on me again? Damn bitch u really can't be trusted!." Shortly after those texts, LEE told DOWNING, "how the police came to my room".

At the same time "M" and LEE were in contact, LEE and DOWNING engaged in a series of graphic text messages about prostitution:

3

| Date & Time | From | To | Text |
|---|---|---|---|
| 08/15/13 10:39:55 AM | Lee | Luck | A p what happened |
| 08/16/13 02:26:42 PM | Luck | Lee | Hey hey hey p sis gave me the green light to be reborn again I'm back now I need to go hard in the paint u dig |
| 08/16/13 02:26:59 PM | Lee | Luck | Lol |
| 08/16/13 02:27:39 PM | Lee | Luck | I got a bad white bitch 4u |
| 08/16/13 02:27:55 PM | Lee | Luck | She on dope though |
| 08/16/13 02:28:27 PM | Lee | Luck | She wanna fuck wit me but I don't wanna deal w wit it |
| 08/16/13 02:29:00 PM | Luck | Lee | O really what's wrong with the bitch p |
| 08/16/13 02:29:21 PM | Lee | Luck | She bad and work in a club. .. tight body tatts and no track marks |
| 08/16/13 02:30:07 PM | Luck | Lee | Putten my jackit back on p. |
| 08/16/13 02:30:42 PM | Lee | Luck | Lol u kno zoc flip mode |
| 08/16/13 02:32:24 PM | Luck | Lee | She the one that came at me p really tho |
| 08/16/13 02:33:04 PM | Lee | Luck | Lol whet she said lol |
| 08/16/13 02:37:16 PM | Luck | Lee | She said we really need the paper and she need to stop standing in my way of getting money and she need to leave the pass in the pass |
| 08/16/13 02:38:01 PM | Lee | Luck | You serious |
| 08/16/13 02:38:20 PM | Lee | Luck | How you know she ain't pulling a stunt |
| 08/16/13 02:38:38 PM | Lee | Luck | U know zoc |
| 08/16/13 02:42:13 PM | Luck | Lee | Its real p. And she said it ain't goin to be no flipmode shit |
| 08/16/13 02:42:24 PM | Lee | Luck | Dig |
| 08/16/13 02:42:54 PM | Lee | Luck | Now you gotta go campaigning you dig |
| 08/16/13 02:43:41 PM | Luck | Lee | I told her that I go hard she said its cool so I'm back p and I see my jackit still fit u dig lol |
| 08/16/13 02:43:56 PM | Lee | Luck | Lol |
| 08/16/13 02:50:35 PM | Luck | Lee | Yeah but being that I'm getting arefard hoe I can just ride in nice and easy lol |
| 08/16/13 02:51:19 PM | Lee | Luck | Lol |
| 08/16/13 02:52:39 PM | Luck | Lee | Man p what else better then coming back into the light and getting a hoe handed to u wow. Lol |
| 08/16/13 02:53:05 PM | Lee | Luck | Lol you funny |
| 08/16/13 02:54:09 PM | Lee | Luck | You can spin De bitch she will fuck wit u p |
| 08/16/13 02:54:48 PM | Lee | Luck | Text her she gave u the numb last week and u just got back in town |
| 08/16/13 02:55:37 PM | Lee | Luck | When u see her let her know you bout this bread and you will keep her habit situated |
| 08/16/13 02:56:19 PM | Lee | Luck | And spread wit De bitch |
| 08/16/13 02:56:56 PM | Lee | Luck | I still got Her I'd |
| 08/16/13 02:57:51 PM | Lee | Luck | She bad p I'm not gonna lie I wanna pimp on her I just know I don't needv any drag around this bitch I got now |
| 08/16/13 03:23:52 PM | Luck | Lee | I'm going to be on your end with the bitch |
| 08/16/13 03:24:21 PM | Lee | Luck | What u mean |
| 08/16/13 03:24:43 PM | Luck | Lee | She wanted u to pick her back up p |
| 08/16/13 03:25:03 PM | Luck | Lee | How old is the b |
| 08/16/13 03:26:15 PM | Lee | Luck | Yes but I don't wanna make no fuckin dope runs p real talk! She just turned 21 last week |
| 08/16/13 03:27:22 PM | Luck | Lee | Did she think u was coming back to pick her up |

| 08/16/13 03:27:37 PM | Luck | Lee | Okay I dig |
| 08/16/13 03:27:59 PM | Lee | Luck | No she knew what it was when I left her |
| 08/16/13 03:28:13 PM | Lee | Luck | She bad though p |
| 08/16/13 03:28:57 PM | Lee | Luck | But right now I got a bitch wit no habits that need my pimping |
| 08/16/13 03:29:27 PM | Lee | Luck | And digging my izm don't wanna mix bad wit good |
| 08/16/13 03:30:00 PM | Lee | Luck | Just ain't get a good vibe not the whole situation |

The "b" (bitch) that "just turned 21 last week" and "wit no habits that need [his] pimping" was a reference to "M".

### Sex Trafficking Victim "MS"

In or about July, 2013 LEE persuaded and enticed "MS" to engage in commercial sex acts for his personal financial benefit, by posting advertisements of her for commercial sex services on Websites like "Backpage". In addition, to monitoring these ads, and managing the business the ads generated, LEE transported "MS" within the State of Maryland in order to further the prostitution business. Specifically, during July 4th weekend, "MS" and LEE rented a room at the Clarion Hotel in Ocean City, Maryland; "MS" uised the room to engage in various commercial sex acts. .

After LEE was arrested on August 26, 2013, DOWNING began pimping "MS" for LEE while LEE was in jail. At the time of LEE's arrest, "MS" was in the hospital being treated for a serious medical condition. DOWNING picked her up from the hospital upon her release in September, and immediately installed her at the Royal Inn. "MS" remained at the Royal Inn, pursuant to DOWNING's instruction, until December 5, 2013 when she was arrested after an undercover officer scheduled a "date" (a commercial sex act) with "MS". Prior to her arrest, "MS" traveled to New York and New Jersey with DOWNING twice, and on both occasions she performed commercial sex acts for money. "MS" would give the money she earned from prostitution dates to DOWNING. DOWNING in turn would give "MS" things that she needed. For example, DOWNING put money on Vanilla cards to be used, among other things, for posting prostitution ads on "Backpage". "MS" did not always tell DOWNING how much money she made and kept some of it. At times, DOWNING drove "MS" to methadone clinics for treatment during this time frame. DOWNING told "MS" that he had other girls working as prostitutes in New York and Florida but that they were on "cruise control."

When "MS" was arrested on December 5, 2013, a search of her cellular telephone was analyzed and numerous contacts with DOWNING were recovered, including several text messages about her success (or lack thereof) getting "dates" on particular days. Specifically, immediately before the "date" with the undercover officer, "MS" had texted DOWNING about the date and to keep "fingers crossed." Another text, on or about November 25, 2013, reveals DOWNING criticizing "MS" for only have one "date" on a particular day. In addition, numerous texts between LEE and "MS" in August revealed "MS" being responsible for scouting locations for LEE and the other females. Specifically, "MS" texts to LEE regarding a military ball taking place at one of the hotels, and that it would be a good place to acquire business because there were not a lot of cameras.

5

Agreed to this 13 day of ~~July, 2014~~ Feb. 2015

Michael Lee

Michael Wesley Lee